In the Matter of the POLYCAST COR-
PORATION, Debtor.

No. 33718.

United States District Court
D. Connecticut.

May 9, 1968.

John W. Barnett, of Wiggin & Dana, New Haven, Conn., for B. Edwin Sackett, trustee.

Richard V. Bandler and Edwin H. Nordlinger, New York City, for Securities and Exchange Commission.

Samuel Gruber, of Gruber & Turkel, Stamford, Conn., for The Polycast Corporation, John O. Beattie, and Paul R. Daddona.

Morris Teig, Stamford, Conn., for Robert L. Cook, Constable of the City of Stamford.

## MEMORANDUM OF DECISION APPROVING CHAPTER X PLAN OF REORGANIZATION

TIMBERS, Chief Judge.

The trustee in reorganization for The Polycast Corporation having submitted to the Court a plan of reorganization and amendments thereto, and a hearing having been held thereon, pursuant to Section 169 of Chapter X of the Bankruptcy Act, 52 Stat. 890, 11 U.S.C. § 569, the Court approves the plan and fixes June 6, 1968 as the date by which acceptances shall be filed by creditors. Specifically, the Court finds, pursuant to Section 174 of Chapter X, 52 Stat. 891, 11 U.S.C. § 574, that the plan, as amended, complies with the provisions of Section 216 of Chapter X, 52 Stat. 895, 11 U.S.C. § 616, and is fair, equitable and feasible. In so finding, the Court determines that The Polycast Corporation is insolvent.

On the basis of the hearings held on April 1 and 15, 1968 for consideration of the plan of reorganization and any objections thereto and on the basis of all papers filed with the Court pursuant to the reorganization of The Polycast Corporation, including written objections to the plan, the Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

(1) On September 6, 1966, The Polycast Corporation, a Connecticut corporation, filed a petition in this Court for reorganization under Chapter X of the Bankruptcy Act, 52 Stat. 883–905, 11 U.S.C. §§ 501–676. On September 12, 1966, the Court approved the petition. On September 15, 1966, the Court appointed B. Edwin Sackett as trustee and authorized the trustee to operate and manage the property of Polycast in accordance with the terms and conditions set forth in the order of appointment.

(2) Prior to commencement of reorganization proceedings, Polycast manufactured cast acrylic sheet and photographic filters. By the time of the trustee's appointment, all operations of the corporation had ceased and all employees had been dismissed. Cash in the bank available to the trustee amounted to $593. The tangible assets of the corporation, including machinery, inventory, furniture and other fixtures, were subject to a lien filed one year earlier by E. I. duPont deNemours, a major creditor. All accounts receivable had been pledged to a financial factor.

(3) The trustee found that it would not be feasible to reinstitute the manufacture of acrylic sheet under the previously used methods of production. Efforts therefore were directed toward the development of a new process of manufacture which had been devised by John O. Beattie, President of Polycast, and which was in an early stage of development at the time the petition was filed. The trustee contacted over forty companies in an unsuccessful effort to obtain

financing for development of the process.

(4) With the help of Mr. Beattie and his wife and Paul R. Daddona, the trustee produced and sold photographic filters in sufficient quantity to permit the plant to be kept open. Although such production and sale continues to date, it is not expected to exceed $60,000 a year in volume. It was apparent to the trustee upon his appointment, and is apparent to him and the Court now, that this operation alone is not a feasible basis for the reorganization of Polycast.

(5) The Court, agreeing with the trustee's determination that the security interest of E. I. duPont deNemours & Company was valid and exceeded the value of the assets to which it attached, authorized the trustee, by order of November 15, 1966, as amended by order of November 30, 1966, to abandon property subject to that security interest. The order, however, required duPont to offer certain specified equipment needed in the development of the new acrylic sheet process to the trustee or his designee at the price of $17,500. This equipment was purchased by Paul R. Daddona, with the consent of the trustee, and thereafter was loaned by him to Polycast for its use without charge.

(6) At the time the reorganization petition was filed, the corporation's offices and plant occupied 77,000 square feet in premises at 69 Southfield Avenue, Stamford, Connecticut. The lease for this space with the landlord, Dora Jacobson, represented an expense of $90,000 a year to the corporation. Upon determining that this space exceeded that needed for the continued operations of Polycast, the trustee filed a petition to reject the lease. This petition was granted by the Court by order of December 28, 1966 and the rejection became effective December 31, 1966. Prior to this time, however, the trustee entered into an agreement with Dora Ja-

cobson for the lease of approximately 14,000 square feet in the basement of the same premises on a month-to-month basis at a rental of approximately $1,500 per month.

(7) The new process for the casting of acrylic sheet has now been developed to the point where three machines are in actual production. This development has been possible only because of the contribution of time, effort and funds by Mr. and Mrs. Beattie, Paul R. Daddona, Anthony Daddona and other members of an investor group. These people contributed the material and labor necessary to construct the machines and have loaned them to the trustee without cost. In fact, the only equipment now owned by the trustee is that used for the production of photographic filters, a boiler, and a typewriter, all having a total value of $22,000.

(8) Sales of acrylic sheet produced by the new process and machines, together with sales of photographic filters, totaled $455,598 for the year ending December 31, 1967. The net profit on these sales, as shown on the unaudited income statement for that year, amounted to $74,734. This figure, however, was computed without provision for the cost of the machinery and equipment on loan without charge to the trustee or for the cost of services of Paul R. Daddona and others which also was contributed without charge. Furthermore, it does not reflect any deductions for trustee's fees or administrative expenses.

(9) The trustee has reasonably projected for the calendar year 1968 net sales of $1,065,154 and a net profit (before allowance for any federal taxes) of $154,558.

(10) With the present plant facilities but with the addition of two machines to the three already in production, the trustee reasonably estimates that the maximum annual sales volume cannot exceed $1,500,000, with a maximum foreseeable profit of 15 percent of sales

(before taxes).[1] Such volume of sales and profit could foreseeably be reached by 1969.

(11) While the new process for the production of acrylic sheet makes reorganization of Polycast feasible, it is by no means a revolutionary process. Larger, well-established companies in the field, such as Rohm & Haas Co., American Cyanamid Company, Cast Optics Division of Escambia Chemical Corporation and National Lead Corporation, produce acrylic sheet by their own successful methods of continuous casting and extrusion. Competition from these sources in all markets will be keen. Furthermore, to date all sales by Polycast of acrylic sheet produced by the new process have been to agencies or departments of the United States Government. The small size sheets produced for this purchaser are not suitable for the commercial market which demands larger sizes. The corporation is not now equipped to produce these larger sizes, nor has it even tested production of these larger sizes by the new process. It is absolutely essential, however, for the future successful operation of Polycast that it enter the commercial market on a competitive basis.

(12) While the shares of common stock of Polycast's established competitors were selling at multiples of 13.8 to 14.6 times 1967 net earnings on or about April 1, 1968, such a high multiple would not be warranted in determining Polycast's present value based on the expectation of future profits. This is particularly true because of the uncertainties connected with development of the new process for commercial, as opposed to government, use. A more realistic multiple of seven times projected earnings has been suggested by the trustee and is adopted by the Court.

(13) Application of this multiple to projected net after tax earnings of $112,000 results in a valuation of Polycast at approximately $784,000. This amount, of course, is less than the total of $1,176,000 in claims of pre-reorganization creditors. Under the plan of reorganization, approximately 13 percent of total equity, or $101,920, would be allocable to those creditors.

(14) Even if the unrealistic multiple of 14 times net after tax earnings were used, the value of Polycast would be $1,568,000 of which 13 percent to the pre-reorganization creditors would amount to approximately $203,000.

(15) Pursuant to the plan of reorganization, the investor group will transfer to Polycast cash, machinery, equipment and other assets having a cost of $312,315 and a fair market value in excess of such amount. In return, this group will receive approximately 81 percent of the total equity in the reorganized corporation. While this is a substantial interest, the Court recognizes that it is fair and equitable in light of the indispensable contribution made by these people to the reorganization of Polycast. Although the assets to be transferred to Polycast include all patent claims of Mr. Beattie with respect to the new process, the trustee has insisted throughout these proceedings that such rights at all times have belonged to Polycast. The trustee, therefore, justifiably has valued the transfer of the patent rights at only $4,500; and the equity interest which the plan provides for the investor group, except to that limited extent, represents not the transfer of these rights but the developmental and financial efforts of Mr. Beattie and the other members of the investor group.

(16) The trustee estimates, and the Court finds, that upon reorganization and after allowance for the payment of priority claims, administration expenses and amounts which creditors under the plan elect to receive in cash, the cash on hand for working capital will amount to

---

1. Thus, the maximum foreseeable before tax earnings will be $225,000 and after tax earnings will be $112,000.

approximately $121,000 and will be adequate for projected operations.

(17) The trustee estimates, and the Court finds, that, assuming prompt consummation of the plan, the reorganized corporation will have total assets of approximately $374,500 and liabilities of approximately $10,000, representing accrued expenses and taxes. Polycast, therefore, will have a net worth of approximately $364,500.

(18) James C. Sargent, Esq., special counsel to Mr. Beattie, Paul R. Daddona and other members of the investor group on matters pertaining to the Securities Act of 1933, has advised the Court that in his opinion shares of new common stock of Polycast may be issued by Polycast pursuant to the proposed plan of reorganization without prior registration under the Securities Act of 1933 by virtue of Section 4(2) of that Act as a "transaction by an issuer not involving any public offering." The Court finds that it is proper for the trustee to rely on such an opinion, subject to compliance with all of the conditions thereof, including the execution by members of the investor group of such investment agreements as may be a condition thereof.

(19) The Securities and Exchange Commission, which has participated throughout these proceedings at the request of the Court, has advised the Court that in its opinion the proposed plan of reorganization, as amended, is fair, equitable and feasible.

## CONCLUSIONS OF LAW

██ (1) The fair value of The Polycast Corporation considered on the basis of the expectation of future income is less than the amount of pre-reorganization claims against the corporation and, therefore, the Polycast Corporation is insolvent.

██ (2) The plan of reorganization, as amended, complies with the provisions of Section 216 of Chapter X, 52 Stat. 895, 11 U.S.C. § 616, and is fair, equitable and feasible.

## OPINION

When the petition for reorganization of The Polycast Corporation was filed, that corporation was for all intents and purposes a dead corporation. It has only been through the dedicated and faithful efforts of the trustee, counsel for the trustee, and the Investor Group, together with what this Court regards as extraordinarily helpful and expert advice to the Court by the Securities and Exchange Commission, that the point now has been reached where the Court is able to approve a plan of reorganization which is fair, equitable and feasible.

 It is, of course, distressing to the Court that the former stockholders of Polycast cannot partake of a share in the reorganized company. But the controlling rule of law recently has been reaffirmed by the Supreme Court in Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968), that "'in any plan of corporate reorganization unsecured creditors are entitled to priority over stockholders to the full extent of their debts.' SEC v. United States Realty & Improvement Co., 310 U.S. 434, 452 (1940)." In other words, the unsecured creditors would have to receive the full value of their claims before any stock could be issued to former shareholders. Since in the instant case the creditors' claims exceed the value of the company even on the basis of an optimistic prediction of future profits and thus the company is insolvent, the Court could not approve any plan which provided for a continued interest in the reorganized company by former shareholders.

While the unsecured creditors will not receive more than 13 percent of the reorganized company at a value of $101,920, in comparison to their claims of $1,176,000, it goes without saying that they are fortunate to receive even this much. The large share of the reorganized corporation which will go to the

investor group is commensurate with and does not exceed the contributions which they have made and will make toward the future of Polycast.

As unfortunate as it is that all cannot now be made whole, the Court is of the opinion that the result now reached here is the best possible result which could be achieved under the circumstances. It has been made possible only through the extraordinary efforts of all those connected with the reorganization of this corporation.