In the Matter of the **POLYCAST COR-PORATION**, Debtor.

**No. 33718.**

United States District Court
D. Connecticut.
July 17, 1968.

John W. Barnett, of Wiggin & Dana, New Haven, Conn., for applicants B. Edwin Sackett, trustee, and Wiggin &

Dana, New Haven, Conn., attorneys for trustee.

Samuel Gruber, of Gruber & Turkel, Stamford, Conn., for applicant Gruber & Turkel, attorneys for The Polycast Corporation, debtor.

Elwood Wiendieck, Greenwich, Conn., pro se for applicant Wiendieck & Co., accountants for trustee.

Edwin H. Nordlinger, New York City, for Securities and Exchange Commission.

## MEMORANDUM OF DECISION ON APPLICATIONS FOR ALLOWANCES IN CHAPTER X REORGANIZATION

TIMBERS, Chief Judge.

In this Chapter X proceeding for the reorganization of The Polycast Corporation, applications for allowances have been filed pursuant to Section 241 of Chapter X, 11 U.S.C. § 641 (1964), as follows:

| Applicant | Fees and Expenses Claimed | | Total Claimed |
|---|---|---|---|
| Wiendieck & Co., accountants for trustee | Fees | $ 3,000.00 | |
| | Expenses | 0 | $ 3,000.00 |
| Gruber & Turkel, attorneys for debtor | Fees | 6,378.75 | |
| | Expenses | 195.00 | 6,573.75 |
| Wiggin & Dana, attorneys for trustee | Fees | 15,000.00 | |
| | Expenses | 890.72 | 15,890.72 |
| B. Edwin Sackett, trustee | Fees | 69,000.00 | |
| | Expenses | 1,108.78 | 70,108.78 |
| Total Fees and Expenses Claimed | | | $95,573.25 |

On May 9, 1968, the Court approved a plan of reorganization of the debtor and in connection therewith filed a memorandum of decision[1] which included findings of fact briefly outlining, among other things, the reorganization proceedings, the nature of the debtor's business, sales figures, value of assets, net worth and estimated available cash assuming prompt consummation of the plan. On July 10, 1968, an order was entered confirming the plan of reorganization.

Brief reference will be made to relevant facts set forth in the Court's memorandum of decision of May 9, 1968 for an indication of the size of the estate and what its administration has involved. Such factors are relevant to a determination of the total amount which the estate can afford to bear and which it should justly pay for the benefit rendered to it, after which an allocation appropriately may be made among the various claimants according to the value of the services they have performed.[2]

### ADMINISTRATION AND SIZE OF ESTATE

In September 1966, after approval of the Chapter X petition, the Court appointed B. Edwin Sackett as trustee and

---

1. In the Matter of The Polycast Corporation, 289 F.Supp. 707 (D.Conn.1968), Bankruptcy No. 33718, May 9, 1968.

2. See Finn v. Childs Co., 181 F.2d 431, 436 (2 Cir. 1950); In re Solar Mfg. Corp., 215 F.2d 555, 557 (3 Cir. 1954).

authorized him to operate and manage the property of the debtor. He has. And he has done so diligently, intelligently and with extraordinary effectiveness, considering that the debtor "was for all intents and purposes a dead corporation" [3] when he took over as trustee.

Prior to the reorganization proceedings, Polycast manufactured cast acrylic sheet and photographic filters. All manufacturing operations had ceased by the time the trustee was appointed; all employees had been dismissed; there was $593 in the bank; all tangible assets were subject to a lien of a major creditor; and all accounts receivable had been pledged to a financial factor. In short, Polycast was not even "two jumps ahead of the wolf." [4]

Upon determining that the former method of manufacturing acrylic sheet would no longer be feasible, the trustee concentrated on the development of a new process which Polycast's former president, John O. Beattie, had begun to develop prior to reorganization. In the meanwhile, in order to permit the plant to be kept open on a limited basis, the production and sale of photographic filters was resumed; but the company's filter operations, with a maximum potential sales volume of $60,000 per year, did not alone provide a feasible basis for reorganization.

Development of the new process for casting acrylic sheet went forward thanks to the contribution of time, effort and funds of an investor group; they contributed the material and labor required to construct the machines which in turn they loaned to the trustee without cost. Three of the contemplated five machines are now in production; a fourth is 90% completed. It is anticipated that for 1968 the company will show a net profit of $154,558 (before taxes) on net sales of $1,065,154; and, with five machines in production, that the maximum foreseeable net profit (before taxes) will be $225,000 on net sales of $1,500,000, possibly in 1969. It is the development of the new process for production of acrylic sheet that made reorganization of Polycast feasible.

The plan of reorganization, which has been approved as fair, equitable and feasible, provides in essence that the company will continue as reorganized; that, the debtor being insolvent, the old common stock has no value and will not participate in the reorganized company; that the reorganized company will be authorized to issue 925,000 shares of new common stock, no par value; that preferred tax claims will be paid in full in cash; that all other creditors, including debenture holders, may elect to receive either $3 for each $100 of claim allowed or 10 shares of new common stock for each $100 of claim allowed; and that the reorganized company will issue 750,000 shares of the new common stock to the investor group in return for the transfer by the investor group to the reorganized company of machinery and equipment, patent rights, other consideration and $150,000 in cash.

After consummation of the plan, the indicated value of Polycast will be approximately $784,000 (compared with the total of $1,176,000 in claims of pre-reorganization creditors who, under the plan, will receive $101,920, or approximately 13% of total equity); it will have total assets of approximately $374,500, less liabilities of $10,000, or a net worth of approximately $364,500; and it will have cash on hand for working capital of approximately $121,000 (after allowance for payment of priority claims, administration expenses and amounts which creditors under the plan elect to receive in cash). The trustee testified at the July 8, 1968 hearing on the applications for allowances that the company's cash position after consummation of the plan would be somewhat better than he had indicated at the April 1 and 15, 1968 hearings on

---

3. In the Matter of The Polycast Corporation, supra note 1, at 710.

4. Taylor v. Standard Gas and Electric Co., 306 U.S. 307, 310 (1939).

approval of the plan—chiefly because less than his earlier estimate of $5,000 would be required to pay creditors who elect to receive cash under the plan.

In the light of this brief summary of the turn-about that has been effected from a virtually dead entity to a going concern which has a fair prospect of a modestly profitable future, and in view of the indicated size of the estate, we turn now to a consideration of the applications for allowances.

## APPLICATIONS FOR ALLOWANCES

On June 12, 1968, the Court entered an order directing that a hearing be held on July 8, 1968, pursuant to Section 247 of the Bankruptcy Act, 11 U.S.C. § 647 (1964), upon all applications for allowances which would have been filed by June 14, 1968.[5] Notice of the hearing was given to all creditors, debenture holders and stockholders of the debtor, as well as to the Securities and Exchange Commission.

Detailed written applications for allowances were filed by each of the four applicants above listed. Each appeared at the July 8 hearing, made brief statements and was available for questioning. The trustee testified at some length. Counsel for the SEC appeared, commented upon each application and made specific recommendations as to each. Aside from the objections stated by the SEC, no other objections were voiced at the hearing. No creditor, debenture holder or stockholder appeared in opposition to any of the applications for allowances. The only written communications received by the Court expressing objection to any application for allowance were a telegram from P. S. Gillcrist on behalf of Union Carbide (a creditor) requesting "careful consideration to reduce trustee fee of $69,000," and a similar letter from Norman Nadel on behalf of Benjamin Nadel & Company (a creditor).

Each of the applications for allowances will now be discussed, in the order listed above. With respect to each, the Court will indicate the amount applied for, the amount recommended by the SEC and the amount allowed by the Court.

### Wiendieck & Co., Accountants for Trustee

■ The accountants' application is for $3,000 for professional services to the trustee from September 16, 1966, the day after the trustee was appointed, to June 12, 1968, the date of the application. No claim is made for expenses. The claim of $3,000 is based on 150 hours, computed at $20 per hour, devoted to the matter by Elwood Wiendieck, a partner of the firm. Attached to the application is a reasonably detailed statement of services rendered.

The SEC recommends that the accountants be allowed $2,000, chiefly on the ground that the Court's order authorizing their employment fixed the rates of compensation at $20 per hour for partners, $15 per hour for senior accountants and $10 per hour for junior accountants; and all the work was done by a partner, whereas some of it was of a nature that could as well have been done by senior or junior accountants. The SEC also points out that the accountants prepared no audit, made no independent confirmation of the accounts receivable and payable and made no investigation or examination.

Normally the Court would be inclined, in view of the provisions of its order authorizing the employment of accountants, to defer to the judgment of the members of the firm as to whether partners, senior accountants or junior accountants should be assigned to specific work. Nevertheless, under all of

---

5. The same order of June 12, 1968 also directed that a hearing be held on July 8, 1968 on the confirmation of the plan of reorganization, notice of which hearing was given pursuant to § 179 of the Bankruptcy Act, 11 U.S.C. § 579 (1964). The hearing was held. No objection to confirmation of the plan was made. An order confirming the plan was entered July 10, 1968.

the circumstances of this reorganization, the Court believes that each of the objections raised by the SEC has merit and, accordingly, each has been taken into account in fixing the fees of the accountants.

The Court allows the firm of Wiendieck & Co. the sum of $2500 for accounting services rendered to the trustee through June 12, 1968.

*Gruber & Turkel, Attorneys for Debtor*

The application by the attorneys for the debtor is for $6,378.75 for professional services from August 30, 1966, the date they were retained to file a Chapter X petition, to June 14, 1968, the date of the application. A claim is also made for $195 expenses. The claim for professional services is based on 182¼ hours, computed at $35 per hour, devoted to the matter by Samuel Gruber, Esq., a member of the firm. Attached to the application is a reasonably detailed statement (with one exception, hereinafter discussed) of services rendered.

■ The SEC recommends that the attorneys for the debtor be allowed $2,000, chiefly on the ground that they were acting as personal counsel to two members of the investor group, John O. Beattie and Paul R. Daddona, at the same time they were representing the debtor; and, accordingly, in estimating what portion of their services was beneficial to the estate and what portion to their individual clients, a larger allocation should be made to the latter. The SEC also points out that 25 hours of their total time is frankly stated to be an estimate and is not based on specific, contemporaneous time records—contrary to Chapter X practice. Finally, the SEC recommends that, of $195 claimed for expenses, only one-half of the $75 for telephone and travel be allowed because it is estimated and not detailed.

■ The position of the SEC with respect to the 25 hours of estimated time is clearly correct.[6] Courts repeatedly have held that, absent detailed, contemporaneous time records, a lump sum time estimate long after the event does not afford an adequate basis for charging a debtor's estate; and this factor is one to be considered in evaluating services. The Court accordingly will treat this fee application as one seeking $5,503.75 based on 157¼ hours.

■ The principal difficulty with the application, as the SEC properly points out, is the appropriate allocation to be made of charges for legal services between the estate and the individual members of the investor group represented by these attorneys. The record shows that the investor group has agreed to give Messrs. Gruber & Turkel 30,000 shares of the new common stock, presently valued at approximately $9,000, as compensation for their legal services to the investor group—wholly aside from whatever compensation may be allowed by the Court for services beneficial to the estate. The Court believes the $35 per hour charge is entirely fair and reasonable, having in mind the standing at the bar, experience and skill of Mr. Gruber. The Court also recognizes the special value of the services rendered by Mr. Gruber at the outset of these proceedings, including his good judgment in insisting (over strenuous opposition) upon a Chapter X reorganization rather than a Chapter XI arrangement; his tenacity on that point may well be regarded as a *sine qua non* to the good result obtained. But of course even that especially valuable service inured to the benefit of his individual clients as well as to the estate. Assuming, without of course deciding, that the aggregate value of his services to the estate and to his individual clients who are members of the investor group was $15,000 (approximately the sum of his application for allowance from the estate and the value of the stock the investor group has agreed to give him), the Court believes, taking into account all considerations pointed out by the SEC,

6. See In re Nazareth Fair Grounds & Farmers Market, Inc., 374 F.2d 595, 597–98 (2 Cir. 1967); In re Hudson & Manhattan Railroad Company, 339 F.2d 114, 115 (2 Cir. 1964).

that a fair allocation of such services to the estate would be reflected in a $3,000 allowance.

The Court further agrees with the SEC's recommendation that $37.50, one-half of the estimated telephone and travel expenses, be allowed, together with the $120 fee for filing the Chapter X petition.

The Court allows the firm of Gruber & Turkel the sum of $3,000 for professional services rendered to the debtor through June 14, 1968, plus $157.50 expenses.

*Wiggin & Dana, Attorneys for Trustee*

The application by the attorneys for the trustee is for $15,000 for professional services from September 14, 1966, the date the undersigned first contacted the firm with a view to its serving as attorneys for the trustee, to June 7, 1968, the date of the application. A claim is also made for $890.72 expenses. The claim for professional services is based on a total of 450 hours, of which 313 hours is computed at $35 per hour for partners' time and 137 hours at $25 per hour for associates' time. Attached to the application are commendably detailed statements of services rendered and expenses incurred; the statement of services rendered, broken down into units as small as ten minutes, is indeed a model of what a schedule of services should be in a Chapter X application for allowance.

The SEC recommends that the attorneys for the trustee be allowed $13,500, chiefly on the ground that some 60 hours of their time was devoted to a suit by the trustee against one Augustin de Rojas for appropriation of trade secrets relating to the photographic filter phase of the debtor's business, the SEC pointing out that production of filters represents a relatively small portion of the company's present business and the value of the settlement of the suit seems hardly proportionate to the time spent. The SEC further notes that, in computing their claim for services, the firm has rounded off the amount indicated by the total hours to the next higher thousand dollar

figure, thus adding $620 to their claim. Finally, the SEC objects to $23.18 of expenses representing lunches.

■ With respect to the time spent on the de Rojas litigation, the Court feels very strongly that it should defer to the combined judgment of the trustee and his attorneys as to the necessity of instituting the suit and the manner of conducting the litigation, including the time required. John W. Barnett, Esq., the Wiggin & Dana partner in charge of the legal work for the trustee, did confer with the undersigned before the suit was instituted; and an order was entered granting permission to bring suit. Moreover, at the hearing on the instant applications for allowances, there was evidence that, in the judgment of the trustee, the timely institution of suit against de Rojas and its vigorous prosecution were vital to enable the debtor to continue in the photographic filter business at the critical interval when it was only that phase of the debtor's business which permitted it to keep its plant open on a limited basis—and thus to gain the time required for development of the new process for casting acrylic sheet. (See page 715, supra). There is substantial evidence, therefor, that the time devoted by the attorneys for the trustee to the de Rojas litigation constituted a vital step in the successful reorganization of the debtor.

■ As for the "rounding off" method of reaching the even figure of $15,000 for professional services rendered, the SEC is correct that this is not appropriate in computing an application for allowances under Chapter X. Normally, the additional $620 claimed as a result of this method of computation would be disallowed because unsubstantiated by detailed time records. With this particular fee application, however, the Court feels that the overall application is so clearly within the bounds of fairness, reasonableness and, indeed, modesty, that, conceding the technical correctness of the SEC's objection, the full amount claimed for professional serv-

ices nevertheless should be allowed. For after all, the amount of time devoted is but one factor to be taken into account. Here the estate has had the benefit of nearly two years of services of one of the most highly esteemed law firms in Connecticut. Mr. Barnett in particular, who personally performed most of the services, has done so with extraordinary skill, intelligence and expedition; and he has demonstrated a Chapter X craftsmanship that usually only long experience can give. As a matter of fact, the Court is satisfied that it is the high degree of expertise of Mr. Barnett and his firm which in large measure is responsible for having brought this Chapter X proceeding to so successful a conclusion so expeditiously. Economy of administration under Chapter X is usually in direct proportion to the speed at which the reorganization proceeds. And when counsel largely responsible for such economy of administration apply for an allowance so obviously fair and reasonable, it should not be whittled away. The undersigned, having had some experience with Chapter X fee applications while serving as General Counsel of the SEC, has never seen a fairer, more reasonable or more modest application for counsel fees under Chapter X than the instant application of Wiggin & Dana as attorneys for the trustee. It is allowed in full.

The SEC's objection to the item of $23.18 for lunches is sustained.

The Court allows the firm of Wiggin & Dana the sum of $15,000 for professional services rendered to the trustee through June 7, 1968, plus $867.54 expenses.

## B. Edwin Sackett, Trustee

The application by the trustee is for $69,000 for services as trustee from September 15, 1966, the date of his appointment, to June 8, 1968, the date of the application. A claim is also made for $1,108.78 expenses. The claim for services is based on a total of 304 days upon which services were rendered, of which 163 full days are computed at $300 per full day and 134 half days are computed at $150 per half day. While the claim for services is not based on an hourly rate, the total of 1195 hours indicates a rate of approximately $57 per hour. Attached to the application are detailed statements of services rendered and expenses incurred; the statement of services rendered is broken down into units as small as five minutes.

The SEC recommends that the trustee be allowed $35,000, chiefly on the ground that the size of the estate, including available cash, does not warrant compensation at the trustee's customary billing rate of $300 for a full day and $150 for a half day; and, furthermore, the trustee's method of billing treats as a half day's work any expenditure of time from 5 minutes up to 3½ hours, and treats as a full day's work any expenditure of time of 3½ hours or more. Applying the trustee's customary billing rate of $300 per day to his total of 1195 hours and assuming a 7½ hour day, the SEC indicates that his services, even at his own rates, would come to $48,000, rather than $69,000. The SEC also recommends disallowance of $127.40 for the trustee's expenses of transportation from his home in Greenwich to the Polycast plant in Stamford, as well as the time charged the estate in making such trips. Finally, the SEC objects to the 6½ hours the trustee has charged the estate for preparation of his fee application.

It is clear to the Court that, regardless of the method of computation, the trustee's application for $69,000 for services is greatly in excess of the amount this estate can afford to bear, having in mind the size of the estate, the available cash and all other relevant factors.[7] Moreover, as the SEC correctly notes, the trustee's method of billing, no matter how appropriate for a commercial client, is definitely improper as a basis for an application for allowance under Chapter X. The Court also sustains the SEC's

7. See Finn v. Childs Co., supra note 2, at 436; In re Solar Mfg. Corp., supra note 2, at 557.

objections to the charges for transportation expenses from the trustee's home to the plant, the time charges for such trips and the time charges for preparing the trustee's fee application.

 Determining a fair and reasonable allowance for the trustee is essentially a matter of judgment on the part of the Court in balancing primarily two competing considerations: the outstanding job the trustee has performed in this reorganization on the one hand, and what the estate can afford on the other.

 Mr. Sackett is a man of unusual ability, of broad experience and extraordinarily well qualified to serve as trustee; otherwise the Court would not have appointed him. Among other accomplishments, he has operated a successful management consulting firm, Sackett Company, during the past 17 years, and continued to serve that firm's clients while he served as trustee of Polycast. It is estimated that he has spent less than half of his time on Polycast matters during the reorganization which has covered a period of less than two years. His services have been of great value to the estate, as the results summarized above demonstrate. As highly as the Court regards Mr. Sackett's services and as much as it recognizes the value of his services to the estate, unfortunately it is impossible to compensate him on the basis of his customary commercial billing rates. The estate cannot afford it and the law does not permit it.

The Court allows the trustee the sum of $40,000 for services through June 8, 1968, plus $981.31 expenses. Pursuant to Article III of the Plan of Reorganization and in accordance with the recommendation of the SEC, the allowance to the trustee for services is to be paid as follows:

$15,000 — To be paid in cash in the year of confirmation of the plan (which means this amount may be paid immediately).

$10,000 — To be paid in cash, one-half not later than one year from the date of confirmation and one-half not later than two years from the date of confirmation.

15,000 — To be paid in shares of the common stock of the reorganized company, the number of shares to be determined in accordance with Article III of the Plan, in the year of confirmation (which means such shares may be delivered immediately).

The allowance to the trustee for expenses may be paid immediately.

## CONCLUSIONS

The following is a summary of the amounts of allowances for services and expenses claimed by each applicant, the amounts recommended by the SEC and the amounts allowed by the Court:

| Applicant | Fees And Expenses Claimed | Recommended by SEC | Allowed by Court |
|---|---|---|---|
| Wiendieck & Co. | $ 3,000.00 | $ 2,000.00 | $ 2,500.00 |
| | 3,000.00 | 2,000.00 | 2,500.00 |
| Gruber & Turkel | 6,378.75 | 2,000.00 | 3,000.00 |
| | 195.00 | 157.50 | 157.50 |
| | 6,573.75 | 2,157.50 | 3,157.50 |
| Wiggin & Dana | 15,000.00 | 13,500.00 | 15,000.00 |
| | 890.72 | 867.54 | 867.54 |
| | 15,890.72 | 14,367.54 | 15,867.54 |
| Sackett | 69,000.00 | 35,000.00 | 40,000.00 |
| | 1,108.78 | 981.31 | 981.31 |
| | 70,108.78 | 35,981.31 | 40,981.31* |
| Totals | $95,573.25 | $54,506.35 | $62,506.35 |

As summarized above, each of the allowances for services rendered is reasonable in amount and each of the allowances for expenses represents reimburse-

* $15,000 in cash now; $15,000 in common stock of the reorganized company now; and $10,000 in cash, payable one-half not later than May 9, 1969 and one-half not later than May 9, 1970—all pursuant to Article III of the Plan of Reorganization.

ment for proper expenses incurred. In each instance the services rendered and expenses incurred, as allowed, were beneficial to the estate

The total allowances aggregating $62,506.35 ($60,500 for services and $2006.35 for expenses) represent a total amount which the estate can afford to bear, having in mind the size of the estate and its available cash; and having further in mind that the cash allowances to be paid immediately total $37,506.35, plus an additional $10,000 within two years (the balance of $15,000 to be paid in stock).

The allowances made in each instance cover services rendered and expenses incurred to the dates of the respective applications, and are without prejudice to the right of the applicants to submit supplemental applications for allowances for additional services rendered and expenses incurred in this proceeding subsequent to the dates of their instant applications.

The Clerk is directed to enter an order, to be submitted by the attorneys for the trustee, in accordance with this decision.

The foregoing constitute the Court's findings of fact and conclusions of law pursuant to Rule 52, Fed.R.Civ.P.

---

The Court believes that it would be in order to express a brief word of appreciation for the role of the Securities and Exchange Commission in making the recommendations it has made with respect to the applications for allowances in this Chapter X proceeding—particularly in view of the trustee's statements at the hearing of sharp disagreement with the SEC's recommendations.

The SEC is a statutory party to this proceeding pursuant to Section 208 of Chapter X, 11 U.S.C. § 608 (1964), having filed its appearance at the Court's request at the very outset of the proceeding. The Court previously has expressed its appreciation for the extraordinarily helpful and expert advice of the SEC throughout the proceeding.[8] In making recommendations with respect to allowances, the role of the SEC is unique and of inestimable value to the Court. While its function is purely advisory, its recommendations are those of about the only wholly disinterested party in the proceeding and are based on many, many years of experience in dealing with parties to corporate reorganizations as well as with the courts.

Although the SEC's recommendations as to allowances may not always be followed, the standard for judicial evaluation of such recommendations which commends itself to this Court is the standard suggested by the late Judge Charles E. Clark, namely, that the SEC's recommendations "should not be exceeded without definite findings and conclusions showing why this step is deemed necessary".[9] That is precisely what this Court has done in the instant case. And that is the standard which has been followed in the District of Connecticut for many years.[10] The risk of disregarding the SEC's recommendations with respect to allowances is that, in so doing, a plan of reorganization which otherwise is fair, equitable and feasible may be transformed into one that is not —as strikingly illustrated by the instant case if anything like the total claimed fees had been allowed.

The Court is deeply grateful to the SEC for its valued advice at this critical stage of this Chapter X proceeding: the fixing of allowances, which has been referred to as "the most thankless and delicate task in all of the problems of ju-

---

8. In the Matter of The Polycast Corporation, supra note 1, at 710.

9. Finn v. Childs Co., supra note 2, at 438.

10. See In re Norwalk Tire & Rubber Co., 96 F.Supp. 274, 276 (D.Conn.1951) (Hincks, D.J.)

dicial reorganization" [11] and "[o]ne of the most disagreeable and perplexing tasks which falls to the lot of a District Judge." [12]

---

11. Frank, Epithetical Jurisprudence and the Work of the Securities and Exchange Commission in the Administration of Chapter X of the Bankruptcy Act, 18 N.Y.U.L.Q.Rev. 317, 349–50 (1941) [quoted in Finn v. Childs Co., supra note 2, at 435].

12. Silver v. Scullin Steel Co., 98 F.2d 503, 506 (8 Cir. 1938) [also quoted in Finn v. Childs Co., supra note 2, at 435].